UNITED STATES DISTRICT COURT

DISTRICT COURT OF MASSACHUSETTS

_____
)
MOHAMMAD BOZORGI, et al., Individually    )
and on Behalf of All Others Similarly Situated,   )
        )
             Plaintiffs,   )     CASE No. 1:24-MC-91041-AK
   vs.         )
        )     CLASS ACTION
CASSAVA SCIENCES, INC. et al,     )
        )
           Defendants.   )
_____)

## NON-PARTY QUANTERIX CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

**TABLE OF CONTENTS**

<u>Page</u>

I.  INTRODUCTION ............................................................................................................... 1

II. BACKGROUND .............................................................................................................. 1

    A.  Allegations Against Cassava Sciences in the Underlying Securities Litigation ..... 1

    B.  Quanterix's Compliance with Plaintiffs' Rule 45 Subpoena ................................. 2

    C.  The Challenged Documents on Quanterix's Privilege Log .................................... 4

III. ARGUMENT .................................................................................................................... 5

    A.  The Requested Discovery is Not Relevant or Proportional. ................................... 5

    B.  The Challenged Documents Are Privileged. ......................................................... 7

    C.  Communications Between Quanterix's Attorneys and Consultants
        Are Protected by the Attorney-Client Privilege. ...................................................... 10

    D.  The Creighton and Taylor Documents Are Attorney-Client Privileged. .............. 16

    E.  Press Release Drafts and the Board Note Are Protected Work-Product. ............. 17

IV. CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banco Do Brasil, S.A. v. 275 Wash. St. Corp.*,
    No. 09-11343-NMG, 2012 U.S. Dist. LEXIS 51358 (D. Mass. Apr. 12, 2012) ...............13, 16

*Bryan Corp. v. ChemWerth, Inc.*,
    296 F.R.D. 31 (D. Mass. 2013) ..................................................................................18, 19, 20

*Cavallaro v. United States*,
    284 F.3d 236 (1st Cir. 2002) ......................................................................................10, 11, 13

*Dahl v. Bain Capital Partners, LLC*,
    714 F. Supp. 2d 225 (D. Mass. 2010) ....................................................................................13

*Diversified Indus., Inc. v. Meredith*,
    572 F.2d 596 (8th Cir. 1977) ..................................................................................................12

*EEOC v. Tex. Roadhouse, Inc.*,
    303 F.R.D. 1 (D. Mass. 2014) ............................................................................................5, 6

*FTC v. GlaxoSmithKline*,
    294 F.3d 141 (D.C. Cir. 2002) ..........................................................................................16, 17

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ............................................................................................................17, 18

*Huffman v. City of Boston*,
    No. 21-10986-ADB, 2023 U.S. Dist. LEXIS 225515 (D. Mass. Dec. 19, 2023) .....................5

*In re Bieter Co.*,
    16 F.3d 929 (8th Cir. 1994) ....................................................................................................16

*In re Copper Mkt. Antitrust Litig.*,
    200 F.R.D. 213 (S.D.N.Y. 2001) ...........................................................................................17

*In re Fin. Oversight & Mgmt. Bd.*,
    386 F. Supp. 3d 175 (D.P.R. 2019) ........................................................................................18

*In re Grand Jury Subpoena*,
    220 F.R.D. 130 (D. Mass. 2004) ............................................................................................20

*In re Grand Jury Subpoena*,
    274 F.3d 563 (1st Cir. 2001) ..................................................................................................10

*In re Grand Jury Subpoenas*,
    265 F. Supp. 2d 321 (S.D.N.Y. 2003) ..............................................................................14, 15

*In re Intuniv Antitrust Litig.*,
   No. 16-cv-12653-ADB, 2018 U.S. Dist. LEXIS 207545 (D. Mass. Dec. 10, 2018) ..........................................................................................................................10

*In re Prograf Antitrust Litig.*,
   No. 1:11-md-02242-RWZ, 2013 U.S. Dist. LEXIS 63594 (D. Mass. May 3, 2013) ...........................................................................................................................16

*Lluberes v. Uncommon Prods., LLC*,
   663 F.3d 6 (1st Cir. 2011) ...................................................................................10, 11, 13

*Lynx Sys. Devs. v. Zebra Enter. Sols. Corp.*,
   No. 15-12297-GAO, 2018 U.S. Dist. LEXIS 52628 (D. Mass Mar. 28, 2018).......................16

*Maine v. U.S. Department of the Interior*,
   298 F.3d 60 (1st Cir. 2002) ................................................................................................17

*Stardock Sys., Inc. v. Reiche*,
   No. 4:17-cv-07025-SBA (KAW), 2018 U.S. Dist. LEXIS 204438 (N.D. Cal. Nov. 30, 2018) .....................................................................................................13, 14, 15

*United States v. Kovel*,
   296 F.2d 918 (2d Cir. 1961)...........................................................................................13, 15

*United States v. Mass. Inst. of Tech.*,
   129 F.3d 681 (1st Cir. 1997) ..........................................................................................19, 20

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981)...................................................................................................10, 16, 20

*Viscito v. National Planning Corp.*,
   No. 3:18-30132-MGM, 2020 U.S. Dist. LEXIS 131235 (D. Mass. July 24, 2020) ...............................................................................................................................6

*United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*,
   475 F. Supp. 3d 45 (D. Mass. 2020) ...........................................................................12, 18, 19

## Other Authorities

Fed. R. Civ. P. 26................................................................................................................17, 20

Fed. R. Civ. P. 45.....................................................................................................................3

Fed. R. Evid. 501 ....................................................................................................................10

## I.     INTRODUCTION

Non-party Quanterix Corporation ("Quanterix"), a company involved in the sale of products and services for biomarker detection and headquartered in Billerica, Massachusetts, opposes the Motion to Compel filed by plaintiffs in consolidated securities litigation pending in Texas (collectively, "Plaintiffs") against Texas company Cassava Sciences, Inc. ("Cassava"). Plaintiffs' motion seeks an order from this Court compelling the production of privileged documents withheld by Quanterix in response to a subpoena issued by Plaintiffs to Quanterix. Quanterix respectfully requests that the Court deny Plaintiffs' motion because Quanterix has otherwise complied with the subpoena, the documents Plaintiffs seek are not relevant to the Plaintiffs' case, and the documents sought are protected by the attorney-client privilege and/or the attorney work product doctrine.

## II.     BACKGROUND

### A.     Allegations Against Cassava Sciences in the Underlying Securities Litigation

Plaintiffs are putative representatives for a class of shareholders suing Cassava and certain Cassava executives in consolidated securities litigation pending in the Western District of Texas. *In re Cassava Sciences, Inc. Securities Litigation*, No. 1:21-cv-00751-DAE (W.D. Tex.).  In that underlying litigation, Plaintiffs allege that Cassava made misrepresentations or omitted material information about the status of Cassava's experimental Alzheimer's therapy known as simufilam, including in data presented by Cassava at an Alzheimer's Association International Conference ("AAIC"). Non-party Quanterix is not, and never has been, a defendant in the underlying litigation against Cassava.  (Doc No. 2 at 1-2).

According to Plaintiffs' allegations in the securities litigation, Cassava's attempt to mislead investors began to unravel on August 24, 2021, when a "Citizen Petition" filed with the FDA became public, revealing concerns about the quality and integrity of Cassava's data. (Doc No. 2 at

2). Cassava denied those allegations in a press statement dated August 25, 2021. Cassava's public

denial included the following statement pertinent to Plaintiffs' Motion to Compel:

> **Fiction**: Biomarker data is generated by Cassava Sciences or its science
> collaborators and therefore are falsified. **Fact**: Cassava Sciences' plasma p-tau data
> from Alzheimer's patients was generated by Quanterix Corp., an independent
> company, and presented at the recent *Alzheimer's Association International
> Conference*. (Doc No. 3-2 at ¶317).

This statement prompted Quanterix to issue its own press release on August 27, 2021, two days

after Cassava's press statement. Quanterix's press release stated, in pertinent part:

> Quanterix or its employees did not interpret the test results or
> prepare the data charts presented by Cassava at the Alzheimer's
> Association International Conference (AAIC) in July 2021 or
> otherwise. (Doc No. 3-2 at ¶323).

According to Plaintiffs, following Quanterix's statement, Cassava's "share price dropped

significantly." (Doc No. 2 at 2). There is no dispute that Quanterix's August 27, 2021, statement

was and remains true. *See* (Doc No. 2 at 2) ("Quanterix did ***not*** prepare the AAIC data or charts

alleged to have been manipulated [by Cassava].") (emphasis in original). Following Quanterix's

August 27, 2021, press release, Cassava issued another press release, stating in pertinent part:

> The Phase 2b clinical study was conducted by Cassava Sciences.
> Quanterix' sole responsibility with regard to this clinical study was
> to perform sample testing, specifically, to measure levels of p-tau in
> plasma samples collected from study subjects…Quanterix' sample
> testing was conducted entirely by its employees. Quanterix'
> employees were blind to treatment group, i.e., they did not know
> which samples were from placebo, or simufilam-treated patients.
> Quanterix conducted sample testing, then sent raw data to Cassava
> Sciences for analysis of treatment effects. (Doc No. 3-2 at ¶324).

### B.     Quanterix's Compliance with Plaintiffs' Rule 45 Subpoena

Plaintiffs issued a Rule 45 subpoena in underlying securities litigation to Quanterix dated

June 15, 2023 ("Plaintiff's subpoena"). On July 11, 2023, within one month of receiving Plaintiff's

subpoena, Quanterix produced 687 documents. Exhibit 1 (7.11.23 Production Letter). In its efforts

to comply with Plaintiff's subpoena, which requested all responsive documents **through the**

**present date**, Quanterix harvested, processed and reviewed all documents that included the word "Cassava" from September 1, 2021 - June 15, 2023. Exhibit 2 at ¶19 (Affidavit of John C. Dougherty). This harvest resulted in over 60,000 documents, which Quanterix expended significant time and resources to cull and review. *Id.* Knowing that many post-August 15, 2021 communications containing the word "Cassava" would be privileged, Quanterix negotiated an arrangement with Plaintiffs in which it was only required to a produce an abbreviated categorical privilege log for communications between August 18, 2021 (date of the Citizen's Petition) and August 28, 2021 (the day following Quanterix's press release). *Id.* at ¶20. During phone calls on June 23, 2023, and July 18, 2023 Plaintiffs' counsel, Megan Rossi, requested an abbreviated privilege log and further represented that Plaintiffs only required the log so they could see the volume of email traffic during the week of the press releases. Complying with this request, Quanterix made a second production on July 20, 2023, consisting of 149 documents and an abbreviated privilege log. Exhibit 3 (7.20.24 Production Letter).

Quanterix has expended, and continues to expend, considerable resources to comply with Plaintiffs' subpoena, all without any reimbursement, or offer for reimbursement, by Plaintiffs. *See* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.")[1]

---

[1] Contrary to the suggestion in Plaintiffs' Motion to Compel that Quanterix has not been burdened in its document production because documents were previously produced to ████████████ in 2021, (Doc No. 2 at 3), this is not so. Quanterix's previous document productions only included documents up until August 26, 2021, and at no point was Quanterix required to produce privileged documents or produce a privilege log, in apparent recognition that such documents were not relevant.

### C.    The Challenged Documents on Quanterix's Privilege Log

During a July 27, 2023, meet and confer requested by Plaintiffs, Plaintiffs' counsel challenged several entries on Quanterix's privilege log, and further demanded a more detailed privilege log, in direct contravention of the parties' earlier agreement for an abbreviated log. In an effort to cooperate, and with further incurred costs, Quanterix made a third production to Plaintiffs on July 28, 2023, producing 8 additional documents with a revised, fully detailed privilege log. Exhibit 4 (7.28.23 Production Letter). Despite Quanterix's production and ongoing cooperation, Plaintiffs demanded another meet and confer, which took place on August 9, 2023. During that meet and confer, Plaintiffs' counsel asked questions regarding certain entries on Quanterix's privilege log, including questions about when Quanterix retained outside counsel and certain communication experts, as well as a history of Quanterix's document productions in response to ███████████████ Quanterix's counsel answered these questions for over an hour, and at the specific request of Plaintiffs, proffered redacted copies of retention agreements with Quanterix's external communication experts to validate their existence. Ex. 2 at ¶21.[2] Following this meet and confer, Plaintiffs further challenged certain entries on Quanterix's privilege log.

Although Quanterix maintained that its conversations with its communication consultants and attorneys were privileged, Quanterix undertook a time intensive and costly redaction process, in which it enacted "line redactions" within clearly privileged conversation, drawing the narrowest of lines possible, in a final effort to comply with Plaintiffs' requests. On September 21, 2023, Quanterix produced 32 additional documents. (Doc No. 3-12). Contrary to Plaintiffs' suggestion, and proving that no good deed goes unpunished, Quanterix's decision to produce these documents is not evidence of its inability to apply the rule of privilege, but rather illustrates that in an effort

---

[2] The executed NDA of one of the external consultants cannot be located despite diligent search efforts. Only an unexecuted and undated word version could be found.

to comply with Plaintiffs' subpoena and avoid further expense and motion practice, Quanterix expended significant resources to redact clearly privileged conversations as delicately as possible. Despite Quanterix's efforts to comply, Plaintiffs served Quanterix with a motion to Compel on February 1, 2024. (Doc No. 1). Except for the 68 documents challenged by Motion to Compel, and discussed in detail below, there is no dispute that Quanterix has complied fully and robustly with Plaintiffs' Rule 45 subpoena at Quanterix's own expense.

## III.   ARGUMENT

### A.   The Requested Discovery is Not Relevant or Proportional.

As a threshold matter, Plaintiffs' Motion to Compel should be denied since Plaintiffs have not established that the documents challenged on Quanterix's privilege log are relevant to its claims against Cassava in the underlying securities litigation, or that the relief they seek in their Motion to Compel against Quanterix is proportional to the needs of their case.

It is well established that information or documents sought by a Rule 45 subpoena "must be: (1) not privileged; (2) relevant to the claim or defense of any party; and (3) proportional to the needs of the case." *Huffman v. City of Boston*, No. 21-10986-ADB, 2023 U.S. Dist. LEXIS 225515, at *3 (D. Mass. Dec. 19, 2023) (M.J. Boal) (citing Fed. R. Civ. P. 26(b)(1)). "A subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)(1)'s overriding relevance requirement. While relevance is generously construed, '[a] party . . . from whom discovery is sought may move for a protective order . . . [and] [t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *EEOC v. Tex. Roadhouse, Inc.*, 303 F.R.D. 1, 2 (D. Mass. 2014) (quoting Fed. R. Civ. P. 26(c)) (alterations in original). Thus, "'the trial court is required to balance the burden of proposed discovery against the likely benefit.'" *Id.* (citing *Gill v. Gulfstream Park Racing Ass'n*, 399 F.3d 391, 400 (1st Cir. 2005)). The balancing test weighs the requesting parties' need for the

information, the availability of other means of obtaining it, and the burden placed on the party receiving the subpoena.  *Id*.

Since the burden of establishing that the requested information is relevant to its claims rests upon the party issuing the subpoena, *Viscito v. National Planning Corp*., No. 3:18-30132-MGM, 2020 U.S. Dist. LEXIS 131235, at *6 (D. Mass. July 24, 2020), Plaintiffs must first establish that the challenged documents it seeks from non-party Quanterix are relevant to its claims against Cassava in the underlying securities litigation. Yet, nowhere in their Motion to Compel do Plaintiffs even attempt to explain why they need the requested documents, let alone establish that those documents are relevant to their case. There is no dispute that the challenged documents are exclusively internal Quanterix communications, each involving a Quanterix lawyer. Plaintiffs cannot show, and have not even attempted to articulate, how these internal Quanterix communications could be relevant to their claims against Cassava.

As plaintiffs state in their Motion to Compel, their case against Cassava alleges that Cassava committed securities fraud by misleading the market about an experimental Alzheimer's drug (simufilam) by, among other things, manipulating Phase 2b clinical trial data presented at an Alzheimer's conference.  According to the Motion to Compel:

> Cassava's Phase 2b plasma p-tau data alleged to have been manipulated "was generated ***by [Quanterix]***, an independent company, and presented at the recent Alzheimer's Association International Conference[]." . . . But, as Plaintiffs allege, Cassava's statements were false and misleading. Quanterix did ***not*** prepare the AAIC data or charts alleged to have been manipulated. Two days later, on August 27, 2021, Quanterix issued its own press release clarifying that Quanterix "did ***not*** interpret the test results ***or*** prepare the data charts presented by Cassava" in the AAIC presentation. Following Quanterix's statement, Cassava's share price dropped significantly. (Doc No. 2 at 2) (emphasis in original) (citations omitted).

As Plaintiffs acknowledge, Quanterix did not prepare the data or charts allegedly manipulated by Cassava, and no one has accused Quanterix of any improper behavior relating to Cassava. Indeed,

Quanterix's press release made clear to the public that it did not interpret or prepare the data charts presented by Cassava. These facts have been well documented publicly since August 2021, and are not contested in the underlying securities litigation.

In responding to Plaintiffs' subpoena, Quanterix undertook to review thousands and produce—at its own costs—approximately 876 documents consisting of non-privileged documents covering the relationship between Quanterix and Cassava, and all communications between the two companies, and the underlying data Quanterix provided to Cassava. To the extent that any of Quanterix's documents are relevant to Plaintiffs' claims against the Cassava defendants, Quanterix has voluntarily produced them. Yet, even armed with all of this information, Plaintiffs cannot articulate why it needs the contested documents. Since Plaintiffs have failed to carry the burden of showing that contested documents, which consist entirely of internal, privileged Quanterix communications between August 26-28, 2021 are relevant to its claims against Cassava in the underlying securities litigation, the Motion to Compel should be denied.

**B.    The Challenged Documents Are Privileged.**

As set forth above, Quanterix's interactions with Cassava are well known and undisputed, and Quanterix has produced to Plaintiffs all the documents evidencing those interactions. Plaintiffs nevertheless are demanding the production of internal Quanterix emails by and among Quanterix attorneys between August 26-28, 2021 where, in addition to Quanterix attorneys and Quanterix management, external communication experts were included. According to Plaintiffs, these contested documents lost their privileged status solely because those external experts were part of those emails. Plaintiffs are mistaken. As explained in detail below, and in Ex. 2 (Affidavit of John C. Dougherty), the external communication experts were involved in those communications in order to assist Quanterix's counsel in advising Quanterix on the legal issues presented by

Cassava's August 25, 2021 and August 27, 2021 press statements, and in anticipation of the litigation that Quanterix's foresaw at the time the contested documents were created.

Beginning on August 25, 2021, when Cassava issued a press release stating that its allegedly falsified data was "generated by Quanterix," Quanterix understood that the nature of the allegations against Cassava and its attempts to feature Quanterix in its public statements were a prelude to litigation or external investigations which could attempt to draw in Quanterix, and that any Quanterix response would need to be guided by legal advice. Ex. 2 at ¶4. To that end, Quanterix immediately supplemented its outside counsel team with a Mintz litigation partner experienced in data integrity investigations, government enforcement, and securities litigation matters. *Id.* at ¶1.

The following day, on August 26, 2021, Quanterix's general counsel, John Fry, engaged Sard Verbinnen & Co. ("Sard Verb"), and consulted with Pan Communications ("PAN Comm") and Heidi Creighton as a public relations experts to provide Quanterix with their expertise to help guide the legal response. *Id*. at ¶¶10-12. Sard Verb, among other responsibilities, was tasked with responding to inquiries from the press and other third parties generated by Cassava's public statements. *Id.* at ¶10. PAN Comm who had previously been retained by Quanterix on other matters, was given a new scope of work specifically related to Cassava's press release, to provide expertise to Quanterix's lawyers so they could provide legal advice to the company. *Id.* at ¶11. Heidi Creighton was also an existing consultant for Quanterix, and at this time, was specifically consulted regarding Cassava. *Id.* at ¶12. Each consultant had an agreement with Quanterix that included confidentiality provisions so that Quanterix could disclose and discuss confidential company information with them. *Id*. at ¶¶10-12.

After careful review of the situation and advice from Quanterix's legal team, who consulted with the external communications consultants, Quanterix issued a press release on August 27,

2021, stating that while it provided raw data to its customer Cassava, it did not interpret test results or prepare the data charts alleged to have been manipulated by Cassava. *Id*. at ¶5; (Doc No. 3-2 at ¶¶16-17, 323, 499). Later that morning, Cassava issued a responsive statement that correctly characterized Quanterix' limited role with respect to the sample testing and reporting. Ex. 2 at ¶7; (Doc No. 3-2 at ¶16).

Quanterix's decision to issue its press release was led by Quanterix General Counsel John Fry, who retained the expertise of outside litigation counsel at Mintz Levin and utilized the communications professionals at PAN Comm, Sard Verb, and Heidi Creighton in order to provide Quanterix with legal advice and how to best respond to Cassava's press release. Ex. 2 at ¶¶3, 5-6. The ultimate decision to issue a press release, and the manner in which it was drafted was in direct response to legal advice and the anticipation of litigation. *Id*. at ¶¶4, 8. As expected, later that day on August 27, 2021, Quanterix was subpoenaed by ████████████████████ ████████ for documents and communications related to Cassava. *Id*. at ¶14. The following day after receiving this subpoena, counsel for Quanterix began drafting a legal strategy for compliance that it could share with Quanterix's board of directors ("Board Note"). *Id*. at ¶ 15. This strategy was also shared with Quanterix's existing business consultant, Jamie Taylor. *Id.* at ¶16. Well prior to the Cassava press release. Taylor entered into NDA's with Quanterix so that Quanterix could disclose and discuss confidential company information with her. *Id.*

On August 31, 2021 Quanterix received a request from ████████████████ ████████████████████ for documents and communications related to Cassava. *Id.* at ¶17. For the next several months, Quanterix, through Mintz Levin, worked to respond to ████████████ ████████ *Id.* at 18. None of the privileged documents sought by Plaintiffs' Motion to Compel were sought by or produced to the ████████████ due to their privileged nature. *Id.*

**C.      Communications Between Quanterix's Attorneys and Consultants Are Protected by the Attorney-Client Privilege.**

Federal common law governs claims of privilege where jurisdiction it premised on a federal question. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); Fed. R. Evid. 501. The attorney-client privilege applies in the following circumstances:

(1)   Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002). The privilege protects communications that are "confidential and are made for the purpose of seeking or receiving legal advice." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011) (quoting *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003)). "By safeguarding communications between attorney and client, the privilege encourages disclosures that facilitate the client's compliance with law and better enable him to present legitimate arguments when litigation arises." *Id.* at 23 (citing *United States v. Mass. Inst. of Tech.*, 129 F.3d 681 (1st Cir. 1997)). The privilege "applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client." *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001) (citation omitted). Federal courts have consistently held that the "attorney-client privilege applies to communications between corporate employees and a corporation's counsel made for the purpose of obtaining or providing legal advice." *In re Intuniv Antitrust Litig.*, No. 16-cv-12653-ADB, 2018 U.S. Dist. LEXIS 207545, at *20-21 (D. Mass. Dec. 10, 2018) (quoting *Fed. Trade Comm'r v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018)).

Communications involving third parties, like the communication consultants in this matter, can be privileged where third parties are employed to assist a lawyer in rendering legal advice.

*Cavallaro*, 284 F.3d at 246-47. The First Circuit has made it clear that communications in pursuit of legal advice are privileged, even where the communication involves agents of the attorney or client: "If the communication contains only client confidences made in pursuit of legal advice – or legal advice based on such client confidences – that communication, if intended to remain confidential, should be covered by the privilege, regardless of whether it came from the client, his attorney, or an agent of either one." *Lluberes*, 663 F.3d at 24.

Against this factual and legal backdrop, Plaintiffs' claim that the contested documents are not attorney-client privileged because they "concern public relations strategy, rather than legal advice," is simply incorrect.  (Doc No. 2 at § IV(A)(1)). Confusingly, Plaintiffs only cite case law regarding the extension of the attorney client privilege to third party consultants. Before addressing why Quanterix's attorney client privilege should extend to communications involving the communications experts, and thus was not waived, Quanterix will address Plaintiffs' apparent contention that the communications by and between Quanterix's in-house and outside counsel were not made for the purpose of seeking and providing legal advice.

Contemporaneous evidence is the most compelling in determining the purpose for retention of counsel. *See Cavallaro*, 284 F.3d at 248. Here, Quanterix engaged Mintz Levin on August 25, 2021 to provide legal advice immediately following Cassava's press release, including advice on if and how to respond to Cassava's statement and the legal implications of Cassava's statement for Quanterix. Ex. 2 at ¶¶2-3. Quanterix also engaged the external communication consultants to assist in providing that advice. The legal strategy implemented by Quanterix's in-house and outside counsel was intentionally informed by, and completely intertwined with, the communication expertise provided by PAN Comm, Sard Verb, and Creighton (collectively "Quanterix PR consultants"). Ex. 2 at ¶¶8-9, 13. Indeed, given the nature of the issues created by Cassava's press statement, it would be extraordinary for Quanterix's counsel not to consult with external

communication experts in formulating their advice. Simply because counsel for Quanterix was discussing a public statement with its consultants does not render those communications made for the purposes of "a PR exercise," rather than legal advice, as Plaintiffs allege. (Doc No. 2 at 13); *See United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*, 475 F. Supp. 3d 45, 65 (D. Mass. 2020) (finding simply because attorney was engaged in an analysis of company policies did not preclude his inquiries from being for the purpose of providing legal advice). *See also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1977) (en banc) (holding where attorney conducted interviews regarding company accounting the communications were protected by attorney client privilege because even though subject matter was not legal, the communication was necessary for the attorney to make an independent analysis and recommendation to the company).

The contested documents on Quanterix's privilege log consist of communications conducted by and between Quanterix's general counsel, outside litigation counsel, and external communications experts for the purposes of drafting a press release aimed at both correcting the public record and distancing Quanterix from certain investigations and litigations to follow. The following entries were withheld or redacted because Sard Verb, PAN Comm, and Heidi Creighton are communicating with Quanterix's General Counsel and/or litigation counsel for the purposes of informing the legal strategy, which was the drafting of the Quanterix press release.

> **PAN Comm/Sard Verb log entries**: 1, 2, 3, 5, 8, 10, 12, 14, 15, 26, 28, 31, 33, 35, 37, 40, 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 60, 61, 62, 63, 64

> **Creighton log entries**: 17, 19, 20, 22, 24, 30, 31

As stated above, Quanterix narrowly tailored its redactions, so that any instances of communications with Quanterix communication experts, which were not directly related to legal advice and strategy, were produced.

The presence of Quanterix communication consultants with Quanterix's legal counsel does not result in a waiver of the attorney-client privilege since those external experts played an integral

and strategic role in facilitating Quanterix counsel's legal advice. "Generally, disclosing attorney-client communications to a third party undermines the privilege. An exception to this general rule exists for third parties employed to assist a lawyer in rendering legal advice." *Cavallaro*, 284 F.3d at 246-47 (internal citations omitted). As the Second Circuit held in *Kovel*[3], "because 'the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others,' the attorney-client 'privilege must include all the persons who act as the attorney's agents.'" *Id.* at 247 (quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961)) (additional citation omitted). Significantly, in assisting the lawyer, the third party's presence must be "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit" and the communication "must be made 'for the purpose of obtaining legal advice from the lawyer.'" *Id.* (quoting *Kovel*, 296 F.2d at 922); *Banco Do Brasil, S.A. v. 275 Wash. St. Corp.*, No. 09-11343-NMG, 2012 U.S. Dist. LEXIS 51358 (D. Mass. Apr. 12, 2012) (Dein, U.S.M.J.) (applying Massachusetts law). The fact that "an attorney's ability to represent a client is merely improved by the assistance of the third party" is not enough to avoid the waiver of the privilege. *Dahl v. Bain Capital Partners, LLC*, 714 F. Supp. 2d 225, 227-28 (D. Mass. 2010).

Courts have applied the *Kovel* doctrine to public relations firms retained to assist the attorneys and the client in making public statements concerning legal matters. "[T]he attorney-client privilege extends to the withheld communications between [a public relations firm hired by the client] and Defendants' counsel pertaining to giving and receiving legal advice about the appropriate response to the lawsuit and making related public statements." *Stardock Sys., Inc. v. Reiche*, No. 4:17-cv-07025-SBA (KAW), 2018 U.S. Dist. LEXIS 204438, at *17 (N.D. Cal. Nov. 30, 2018) (quoting *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003)) (internal quotation

---

[3] The First Circuit has "never actually adopted *Kovel*, despite its pedigree and wide acceptance, but [has] assumed for the sake of argument that [it] would do so in the right case." *Lluberes*, 663 F.3d at 24 n.20 (citing *Cavallaro*, 284 F.3d at 247 n.6).

marks omitted). Under this formulation, a communications firm is deemed to "'come within the attorney-client privilege, as they have a close nexus to the attorney's role in advocating the client's cause before a court.'" *Id.* at *9-10 (quoting *In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 326). The firm's involvement must be related to and assist the lawyer in providing legal advice. *In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 326.

In *In re Grand Jury*, the Southern District of New York expanded on the significance of the public relations consultants' role in influencing legal strategy in high-profile matters where there is intense press scrutiny. 265 F. Supp. 2d 321 (S.D.N.Y. 2003). Public relations consultants are required in such situations because "dealing with the media in a high profile case probably is not a matter for amateurs. [Clients and their] lawyers cannot be faulted for concluding that professional public relations advice [is] needed." *Id.* at 330. Under such circumstances, a communication consultants' role is fundamentally intertwined with the provision of legal advice because "[q]uestions such as whether the client should speak to the media at all, whether to do so directly or through representatives, whether and to what extent to comment on specific allegations, and a host of others can be decided without careful legal input only at the client's extreme peril." *Id.* The Court went on to explain that:

> the ability of lawyers to perform some of their most fundamental client functions - such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication - would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants. For example, lawyers may need skilled advice as to whether and how possible statements to the press - ranging from 'no comment' to detailed factual presentations - likely would be reported in order to advise a client as to whether the making of particular statements would be in the client's legal interest. And there simply is no practical way for such discussions to occur with the public relations consultants if the lawyers were not able to inform the consultants of at least some non-public facts, as well as the lawyers' defense strategies and tactics, free of the fear that the consultants could be forced to disclose those discussions. *Id.* at 330-31.

14

Consequently, the Court held that confidential communications with public relations consultants retained by attorneys to help with media inquiries in high profile cases and made for the purpose of providing advice in order to address the client's legal problems are protected by the attorney-client privilege. *Id.*; *see Stardock Sys.*, 2018 U.S. Dist. LEXIS 204438 (holding attorney-client privilege applied to communications with public relations firm hired specifically for the purpose of providing litigation strategy).

The contested documents satisfy the *Kovel* requirements. The input of Quanterix's external communications experts was necessary for Quanterix's counsel to formulate and provide Quanterix with legal advice. Unlike the consultants in *Wollman*, who only provided a third party service unrelated to legal advice, Sard Verb, PAN Comm, and Creighton were consulted in order to manage media inquiries regarding the fallout from Cassava's press release, and inform Quanterix's overall legal strategy, including whether and how to issue a statement in response to Cassava's public statements. The management of inquiries following Cassava's press release was fully driven by legal input from its attorneys. While some aspects of Sard Verb and PAN Comm's work was public facing, the strategy and implementation of that work relied on legal strategies shared with them by Quanterix attorneys. Open communication between Sard Verb, PAN Comm, and Quanterix's attorneys was essential to the development of the legal advice provided by Quanterix's counsel.

Similar to the public relations consultants in *In re Grand Jury* who were tasked to help counter the growing public pressure on prosecutors to indict, Quanterix's communication consultants were engaged by Quanterix's legal team in order to distinguish Quanterix from Cassava in hopes of deterring targeted investigations and derivative lawsuits. Just as in *In re Grand Jury*, Quanterix's consultants did not engage in typical publicity campaigns because their audience was

not simply the general public, but potential plaintiffs and government actors responsible for investigating the allegations against Cassava.[4]

### D.    The Creighton and Taylor Documents Are Attorney-Client Privileged.

The attorney-client privilege also extends to Quanterix's communications with Heidi Creighton and Jamie Taylor.  Each of them served as a "functional equivalent" of a Quanterix employee.  When a third party is functionally the equivalent of an internal employee, its communications are protected just as if the third party was an employee of the company asserting the privilege. *FTC v. GlaxoSmithKline*, 294 F.3d 141 (D.C. Cir. 2002); *see also In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994). The functional equivalent doctrine provides that certain third-party agents of corporate entities, such as consultants, can be considered the "functional equivalent" of corporate employees by virtue of their close connection to the corporate entity. *See Lynx Sys. Devs. v. Zebra Enter. Sols. Corp.*, No. 15-12297-GAO, 2018 U.S. Dist. LEXIS 52628, at *6-7 (D. Mass Mar. 28, 2018).[5] The functional equivalent analysis "allows communications between . . . agents and corporate counsel to fall within the scope of *Upjohn*, which protects communications between corporate employees and corporate counsel." *Id.* at *6 (citation omitted); *see also In re Bieter Co.*, 16 F.3d at 929. Where corporate counsel works with a high-level consultant in the same manner it engages with full time employees, and where the consultant becomes an integral member of the team assigned to deal with issues that are "completely intertwined with [the company's]

---

[4] The facts here are easily distinguishable from the consultant in *Wollman*, who was not retained to assist in existing or objectively imminent litigation. Quanterix external consultants were engaged at the same time Quanterix added an experienced Mintz Levin litigator to the team, who along with Quanterix's General Counsel, believed governmental inquiry and subsequent litigation was a certainty. *See also In re Prograf Antitrust Litig.*, No. 1:11-md-02242-RWZ, 2013 U.S. Dist. LEXIS 63594, at *9 (D. Mass. May 3, 2013) (communications with public relations firm were not privileged were the firm merely provided standard public relations services related to the filing and outcome of the citizens petition and any subsequent business or media fall out).

[5] Although this doctrine has not yet been applied in this Circuit, Courts acknowledge the doctrine and suggest it should be applied where the facts permit. *See Lynx*, 2018 U.S. Dist. LEXIS 52628 (noting functional equivalent doctrine has not been adopted within this Circuit or applied within this District, but declining to apply it where third party did not meet standard); *Banco Do Brasil, S.A.*, 2012 U.S. Dist. LEXIS 51358 (applying Massachusetts law and recognizing functional equivalent doctrine, but declining to apply it on the facts).

litigation and legal strategies[,]" then the privilege extends to communication with the company's consultants. *See FTC*, 294 F.3d at 148 (Bader Ginsburg, J.); *see also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213 (S.D.N.Y. 2001) (holding external public relations firm was "functional equivalent" of an employee of the defendant and upholding attorney-client privilege).

Privilege log entries 65 and 67 which Quanterix CEO Kevin Hrusovsky forwards Taylor and Creighton a message from his General Counsel and attaches a summary drafted by outside litigation counsel, should be protected under the attorney-client privilege because Taylor and Creighton are being treated as functional equivalents of corporate employees by virtue of their close connection to the corporate entity. Similarly, Privilege log entry 59 in which Hrusovsky forwards a Mintz Levin legal strategy summary ("Board Note") to Quanterix consultant Jamie Taylor should be should be treated as privileged via the functional equivalent doctrine. The consultants' close business relationships with Quanterix's executive officer resulted in them entering NDA's with Quanterix so that they could be consulted on sensitive and confidential business information. It is clear by the nature of the information Hrusovsky shared with Taylor and Creighton that he considered them integral members of the team assigned to deal with issues intertwined with Quanterix's legal strategies.

### E.    Press Release Drafts and the Board Note Are Protected Work-Product.

While Quanterix believes that each of the contested documents is covered by the attorney-client privilege, they are also protected by the attorney work product doctrine, which shields from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3); *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947);. The core purpose of the privilege "is to protect the adversary trial process itself", *Maine v. U.S. Department of the Interior*, 298 F.3d 60, 66 (1st Cir. 2002) (internal quotation marks

omitted), and to preserve a "zone of privacy" within which a lawyer can prepare and develop legal theories and strategy "with an eye toward litigation." *Hickman*, 329 U.S. at 510-11. The work-product doctrine precludes discovery of work that is reflected in interviews, statements, memorandum, correspondence, briefs, mental impressions, and personal beliefs. *Bryan Corp. v. ChemWerth, Inc*., 296 F.R.D. 31, 37 (D. Mass. 2013) (Dein, U.S.M.J.).

In the First Circuit, a document is protected by the work-product doctrine if it is prepared for any litigation, as long as it was prepared by or for a party to the subsequent litigation. *In re Fin. Oversight & Mgmt. Bd.*, 386 F. Supp. 3d 175, 186-87 (D.P.R. 2019) (Dein, U.S.M.J) (citing *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 27 (1st Cir. 2009)). In addition to being prepared in anticipation of litigation, to qualify as work product, the document must not have been prepared in essentially similar form irrespective of the litigation. *Wollman*, 475 F. Supp. 3d at 61-62 (citing *Zagklara v. Sprague Energy Corp.*, No. 2:10-cv-445-JAW, 2011 U.S. Dist. LEXIS 67540, at *4 (D. Me. June 22, 2011)).

Here, the record reflects that the decision to draft Quanterix's press release and the manner in which it was drafted resulted from the anticipation of litigation and directly related to the company's legal strategy. John Dougherty states that at the time of his engagement with Quanterix he immediately suspected Quanterix would receive government agency subpoenas, or be drawn into shareholder and derivative suits.  The decision to draft a press release at all, and the wording of the press release was a direct result of Attorney Dougherty's anticipation of litigation and his advice to Quanterix. Further at the time of the statement's drafting, Attorney Dougherty understood drafts of the press release, which were revised by himself, Quanterix's General Counsel John Fry, and PAN Comm and Sard Verb to be confidential and protected work product. Ex. 2 at ¶6. Attorney Dougherty's ability to predict a ███████████████ one day before receiving the subpoena is exactly why Quanterix retained him to provide legal advice. Quanterix should not

be punished by being compelled to disclose attorney work product simply because its litigation counsel correctly anticipated litigation one day before it received a ███████████.

Unlike the Defendants in *Wollman*, Quanterix has presented evidence that its attorneys "would not have created the document in essentially the same way had the prospect of litigation not existed, much less a showing that such a subjective belief was objectively reasonable." *Wollman*, 475 F. Supp. 3d at 61 (citation omitted). Further, unlike the Defendant in *Wollman*, Quanterix has established that the press release was in fact prepared for use in possible litigation. *Id.* at 62. Privilege log entries 4, 6, 7, 9, 11, 13, 16, 18, 21, 23, 25, 27, 29, 32, 34, 36, 38, 39, 42, consisting of Quanterix's draft press releases with revisions and comments by its attorneys and PR consultants should be protected from disclosure under the work product doctrine.

Additionally, Quanterix's August 28, 2021 "Note to Board" was drafted by Quanterix outside litigation counsel following the receipt of the ███████ the day prior. The purpose of the memorandum was to inform Quanterix board members and its in-house legal team of the general situation involving Cassava, Quanterix's legal rational in drafting a press release, and Quanterix's strategy in responding to the ████. This document was both prepared in anticipation of litigation, ███████████████████████ and would not have been drafted in the same manner without the existence of this litigation. Ex. 2 at ¶15. As such entries 65 and 68 (and non-challenged entry 70) should be protected under the work product doctrine.

Quanterix did not waive the work-product protection by sharing drafts of the press release with its external communication consultants because disclosure of work product to a third-party does not necessarily waive the protection— only disclosing material in a way inconsistent with keeping it from an adversary waives work-product protection. *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997); *see Bryan Corp.*, 296 F.R.D. at 31. Sard Verb, PAN Comm, nor Creighton were outside of the "zone of privacy" that the doctrine is intended to protect, which allows a party,

his attorney, and non-attorney representatives to prepare for litigation free from unnecessary intrusion of adversaries. *See In re Grand Jury Subpoena*, 220 F.R.D. 130, 141 (D. Mass. 2004) (quoting *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998)). Under the same analysis, Quanterix did not waive its work product privilege of the August 28, 2021 "Board Note" by disclosure to Jamie Taylor or Heidi Creighton because both consultants were under NDA's with Quanterix and were clearly believed by Quanterix's CEO to fall within the zone of privacy. Lastly, Quanterix never gave draft press releases, the Board Note, or any related materials to an adversary. *Contrast Mass. Inst. of Tech.*, 129 F.3d at 687 (work-product protection waived through disclosure of billing statements and minutes to audit agency that was potential adversary).

Lastly, as noted earlier in this Opposition, Plaintiffs have not even attempted to meet their relevancy burden.  Nor have they met the even higher standard for obtaining work product under Fed. R. Civ. P. 26(b)(3)(A)—nor could they. That rule requires a requesting party to show a "substantial need for the materials to prepare its case" and that they "cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). The draft press releases and Board Note are all opinion work-product, because, they "contain the mental impressions, conclusions, opinions, or legal theories of an attorney." *See In re Grand Jury Subpoena*, 220 F.R.D. 130, 144 (D. Mass. 2004); Ex. 2 at ¶¶ 6, 15. Opinion work product may only be discovered "in rare circumstances" after a "highly persuasive showing." *Id*. at *145; *see Upjohn*, 449 U.S. at 400-01 (forced disclosure of memoranda is "particularly disfavored because it tends to reveal the attorney's mental processes"). Because Plaintiffs can obtain the information they seek by simply reading the final Quanterix press release, taking depositions of witnesses and reviewing non-privileged documents produced by Quanterix, they are not entitled to the draft press releases, the board note, or any additional logged attorney work product. *See Bryan Corp.*, 296 F.R.D. at 42.

**IV.**     **CONCLUSION**

For the foregoing reasons, Quanterix respectfully requests that Plaintiffs' Motion to Compel Production of Documents be denied and that Quanterix be awarded the costs of opposing Plaintiffs' Motion. Quanterix requests oral argument.

Dated:  February 22, 2024

Respectfully submitted,

**NON-PARTY QUANTERIX CORPORATION**

By its attorneys,

_(signature)_

Katherine Galle, BBO # 691660
John C. Dougherty, BBO # 569186
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel:  (617) 542-6000
kngalle@mintz.com
jcdougherty@mintz.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on February 22, 2024.

_Katherine Galle_

Katherine Galle

514689122v1