UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MOHAMMAD BOZORGI, *et al.*, | ) | |
| individually and on behalf of all others | ) | Originating No. 1:21-cv-00751-DAE |
| similarly situated, | ) | (W.D. Tex.) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:24-mc-91041-AK |
| v. | ) | |
| | ) | CLASS ACTION |
| CASSAVA SCIENCES, INC., *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| QUANTERIX CORPORATION, | ) | |
| | ) | |
| Respondent. | ) | |

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS (#1).**

Kelley, U.S.M.J.

This securities fraud class action originates in the Western District of Texas, *see In re Cassava Sciences, Inc. Sec. Litig.*, No. 1:21-cv-00751-DAE (W.D. Tex.) (the "underlying litigation"), and involves allegations that defendant Cassava Sciences, Inc. ("Cassava") misled the market about its experimental Alzheimer's drug, simufilam. (#2 at 5.) Here, plaintiffs seek to enforce a subpoena issued under Rule 45 of the Federal Rules of Civil Procedure (the "Subpoena") on non-party Quanterix Corporation ("Quanterix"), a company headquartered in Billerica, Massachusetts. *Id.*; (#20 at 5) Quanterix asserts attorney-client privilege and/or work product

protection over the documents at issue.   (#20 at 5.)   For the following reasons, this court recommends that the court <u>deny</u> plaintiff's motion to compel.[1]

I.   <u>Background</u>.

    a.   <u>Relevant facts</u>.

Plaintiffs are putative representatives for a class of shareholders suing Cassava and certain Cassava executives for allegedly misleading the market regarding the efficacy of simufilam by, among other things, concealing data manipulation, significant anomalies, and conflicts of interest that tainted its research.  (#2 at 7; #20 at 5); *see also* #3-2 (underlying litigation compl.).  Quanterix is not, and never has been, a defendant in the underlying litigation.  (#20 at 5.)

Relevant here are a series of press statements that followed the August 24, 2021 publication of a "Citizen Petition" filed with the U.S. Food and Drug Administration ("FDA").  (#2 at 7-8; #20 at 5-6.)   The Citizen Petition revealed "grave concerns about the quality and integrity of the laboratory-based studies surrounding" simufilam, including allegations that Cassava had purposefully removed data points from a July 2021 Alzheimer's Association International Conference ("AAIC") to make the results appear more significant than they were.  (#2 at 8.)

Cassava denied the Citizen Petition allegations in a press statement dated August 25, 2021 (the "**First Cassava Statement**"), in which it stated:

> **Fiction:**   Biomarker data is generated by Cassava Sciences or its science collaborators and therefore are falsified.  **Fact**:  Cassava Sciences' plasma p-tau data from Alzheimer's patients was generated by Quanterix Corp., an independent

---

[1] District Judge Angel Kelley referred this motion to the undersigned Magistrate Judge.  (#25.) Resolution of plaintiffs' motion will dispose of this miscellaneous case; therefore, the court treats it as a dispositive motion and issues a report and recommendation.  *See ML-CFC 2007-6 Puerto Rico Props., LLC v. BPP Retail Props., LLC*, 951 F.3d 41, 46-47 (1st Cir. 2020); *Patton v. Johnson*, 915 F.3d 827, 832 (1st Cir. 2019) ("As Article I judicial officers, magistrate judges ordinarily may not decide motions that are dispositive either of a case or of a claim or defense within a case." (quoting *Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 13 (1st Cir. 2010) (internal quotation marks and alterations omitted)).

company, and presented at the recent *Alzheimer's Association International Conference.*

(#20 at 6); *see* #3-2 at ¶ 317.  The First Cassava Statement prompted Quanterix to issue its own press release on August 27, 2021 (the "**Quanterix Statement**"), which clarified that, although Quanterix had generated the raw data in Cassava's AAIC presentation, it "did not interpret the test results or prepare the data charts presented by Cassava at the [AAIC] in July 2021 or otherwise." (#2 at 8; #20 at 6); *see* #3-2 at ¶ 323. Later that day, Cassava issued another press release (the "**Second Cassava Statement**") that confirmed

> [t]he Phase 2b clinical study was conducted by Cassava Sciences.  Quanterix' sole responsibility with regard to this clinical study was to perform sample testing, specifically, to measure levels of p-tau in plasma samples collected from study subjects . . . Quanterix' sample testing was conducted entirely by its employees. Quanterix' employees were blind to treatment group, i.e., they did not know which samples were from placebo, or simufilam-treated patients.  Quanterix conducted sample testing, then sent raw data to Cassava Sciences for analysis of treatment effects.

(#20 at 6); *see* #3-2 at ¶ 324.  Plaintiffs allege that Cassava's share price dropped "17.66%, on unusually heavy trading volume" following release of the August 27 statements.  (#2 at 8; #20 at 6); *see* #3-2 at ¶¶ 323-27.

    b.   The Rule 45 Subpoena and Quanterix's response.

On June 15, 2023, plaintiffs served Quanterix with the Subpoena, which included requests for documents related to the Quanterix Statement, the poster Cassava presented at the AAIC, and the scientific results discussed in them from January 1, 2020 to the present. (#2 at 9); *see* #3-1 at 11-13 (RFPs 3-5).[2]  On July 11, 2023, Quanterix produced 687 responsive documents.  (#20 at 6.) A series of meet and confers followed, after which on July 20, 2023, Quanterix produced an

---

[2] Plaintiffs' original Subpoena identified the District of Delaware as the place for compliance.  (#2 at 5 n.1.)  By agreement of the parties, plaintiffs served an identical Subpoena on Quanterix's counsel on December 11, 2023, amended only to specify compliance is required in this District, where Quanterix is located.  *Id.*  The court cites to the amended Subpoena.  *See* #3-1.

additional 149 documents and, per the parties' agreement, an abridged privilege log, (*id.* at 7; #2 at 9). On July 28, 2023, Quanterix produced an additional eight documents that it had previously withheld or redacted, as well as a revised, "fully detailed" privilege log, (#20 at 8; #2 at 9). Plaintiff claims that these eight documents "were plainly not privileged." (#2 at 9-10.)

On August 9, 2023, the parties engaged in another meet and confer, during which plaintiffs requested information regarding retention of Quanterix's outside counsel and certain public relations ("PR") experts that appeared on Quanterix's privilege log. (#2 at 10; #20 at 8.) At plaintiffs' request, Quanterix provided redacted copies of retention and non-disclosure agreements with the PR experts.[3] (#20 at 8.) On September 21, 2023, Quanterix produced an additional 32 documents with line redactions that had previously been withheld fully, as well as an updated privilege log with 70 entries. (#20 at 8-9; #2 at 12.)

II.   <u>Plaintiffs' Motion to Compel (#1).</u>

Plaintiffs' motion to compel challenges 68 of the 70 entries on Quanterix's most recent privilege log. (#1.) They assert that the inclusion of external PR experts on those communications destroyed privilege because the communications at issue concern a communications strategy, not legal advice. (#2 at 15-21.) They further argue that the work product doctrine does not apply because the documents were created as a PR campaign, not in anticipation of litigation or government investigation, which in any event was too attenuated at the time of creation to support protection. *Id.* at 21-24; (#23 at 3, 5-6.) In the alternative, plaintiffs requested *in camera* review of a subset of eleven unredacted documents, along with any withheld attachments. (#2 at 24.) Quanterix maintains that the PR experts were sought by and necessary to the company's legal team

---

[3] Quanterix was unable to locate an executed copy of the non-disclosure agreement with one of the external consultants and instead provided an unexecuted and undated Word version. (#20 at 8 n.2.)

in navigating the maelstrom that followed the First Cassava Statement, rendering the communications privileged and/or protected work product.  (#20.)

The court heard argument on April 25, 2024, after which it ordered Quanterix to produce *ex parte* the documents identified in plaintiffs' motion.  (#29.)  Quanterix did so on April 30, 2024.

III.   <u>Legal Standard</u>.

The elements of the attorney-client privilege are as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor (8) except the protection be waived."

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J. H. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961)).  "The privilege 'protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice.'"  *United States ex. rel. Wollman v. Massachusetts Gen. Hosp., Inc.*, 475 F. Supp. 3d 45, 63 (D. Mass. 2020) (quoting *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011)) (cleaned up); *see Crane Sec. Tech., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 15-16 (D. Mass. 2017) (Kelley, M.J.) ("Communications must 'have been intended to be confidential and made for the purpose of giving or obtaining legal advice' to qualify as privileged." (quoting *Cavallaro*, 284 F.3d at 245)).

"Generally, disclosing attorney-client communications to a third party undermines the privilege." *Cavallaro*, 284 F.3d at 246-47.  There are exceptions, however, such as when an expert is employed to assist a lawyer in rendering legal advice.  *Id.* (citing with approval *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961), in which the Second Circuit applied this exception to communications involving an accountant who was assisting an attorney in preparing a client's case: "[B]ecause 'the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others,' the attorney-client 'privilege must include all

persons who act as the attorney's agents'" (internal citations omitted)).  "Significantly, in assisting the lawyer, the third party's presence must be 'necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit' and the communication 'must be made for the purpose of obtaining legal advice from the lawyer.'" *Wollman*, 475 F. Supp. 3d at 66 (quoting *Cavallaro*, 284 F.3d at 247) (additional citations omitted); *see Crane*, 230 F. Supp. 3d at 15 ("The court in *Cavallaro*, however, stressed that the third-party's assistance must be nearly indispensable or serve some specialized purpose in facilitating attorney-client communications."); *Dahl v. Bain Capital Partners, LLC*, 714 F. Supp. 2d 225, 227 (D. Mass. 2010) ("The exception . . . does not apply to instances where an attorney's ability to represent a client is merely improved by the assistance of the third party.").  Moreover, the advice must be legal; business advice will not sustain the exception.  *Dahl*, 714 F. Supp. 2d at 228 (citing *Cavallaro*, 284 F.3d at 248-29; *Kovel*, 296 F.2d at 922; and *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 111 (S.D.N.Y. 2005)).

The work product doctrine protects documents "that are prepared in anticipation of litigation or for trial by or for another party or its representative. . . ."  Fed. R. Civ. P. 26(b)(3); *see Wollman*, 475 F. Supp. 3d at 61.  The doctrine does not protect "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'"  *U.S. v. Textron Inc. & Subsidies*, 577 F.3d 21, 30 (1st Cir. 2009) (quoting *Maine v. United States Dep't of Interior*, 298 F.3d 60, 70 (1st Cir. 2002)).

The party who invokes either privilege/protection bears the burden of establishing that it applies.  *See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003); *Felisberto v. Dumdey*, 541 F. Supp. 3d 142, 147 (D. Mass. 2021) ("As in the case of other privileges, "[t]he party seeking work product protection has the burden of

establishing its applicability." (quoting *In re Grand Jury Subpoena*, 220 F.R.D. 130, 140 (D. Mass. 2004)).

IV.    <u>Discussion</u>.

The court reviewed *in camera* the documents Quanterix submitted, *see* #29, and finds that the documents are privileged.[4]  The court credits Attorney Dougherty's affidavit in support of Quanterix's motion, *see* #20-5 (sealed), which details the context within which the documents were written, where attorneys were called in on an emergency basis to respond to what was perceived to be a crisis.  Drafting the Quanterix Statement was inextricably enmeshed with the discussion and implementation of legal advice sought to minimize potential liability and/or avoid government investigations, both of which were rationally foreseeable under the circumstances. The PR specialists' expertise was sought, in this instance, by Quanterix's attorneys in furtherance of these legal goals, and was integral to the attorneys' provision of effective legal advice.  In other words, this is not a case in which PR specialists were enlisted to "battle[e] . . . bad publicity," *see In re Valeant Pharma. Int'l, Inc. Sec. Litig.*, Master No. 3:15-cv-07658-MAS-LHG, 2021 WL 3140050, at *6 (D.N.J. July, 22, 2021), but rather one in which media expertise was necessary to assess the risks and liabilities associated with how to respond publicly—and indeed, whether to respond at all—to an announcement that had implicated Quanterix in wrongdoing and opened it up to civil liability and/or government investigation.[5]  Such communications fall within the

---

[4] Because the court finds the *in camera* submission is privileged, it need not address Quanterix's relevancy challenge.  *See* #20 at 9-11.

[5] This case is thus distinguishable from the caselaw on which plaintiffs rely, in which the courts invariably found, after *in camera* review, that the PR experts had functioned in a purely PR capacity by, e.g., assessing reputational risks, neutralizing negative press, and/or managing public opinion.  *Cf. e.g.*, *Valeant Pharma.*, 2021 WL 3140050, at *14 (concluding based on his review of the record "that [the PR firm's] services consisted of general public relations assistance, the primary purpose of which was to present a favorable public image of [the company], not to assist its attorneys in litigation"); *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y.

privilege's scope.  *See Crane*, 230 F. Supp. 3d at 25 (finding communications with investment

banker retained by plaintiff to assist attorney with a particular transaction, and whose advice "was

necessary, or required" for the attorney to render advice to his client, was privileged); *see also In*

*re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330-31 (S.D.N.Y. 2003) ("[L]awyers may need

skilled advice as to whether and how possible statements to the press—ranging from 'no comment'

to detailed factual presentations—likely would be reported in order to advise a client as to whether

the making of particular statements would be in the client's legal interest.").

---

2019)  ("The PR firms here were not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals. Rather, the PR firms were involved in public relations activities aimed at burnishing [the company's] image."); *Wollman*, 475 F. Supp. 3d at 67 ("In the instant case, however, once the [litigation] concluded, [the PR firm] was not retained to assist in any existing or objectively imminent litigation. Moreover, the [investigation] was conducted in 2011, and the Globe Spotlight team's investigation was taking place in 2014-2015. Where, as here, the public relations firm was far from serving the kind of 'translator' function served by the accountant in *Kovel*, and is, at most, simply providing ordinary public relations advice, the communication of privileged information to the PR firm waives the attorney-client privilege." (cleaned up)); *Gattineri v. Wynn MA, LLC*, No. 18-cv-11229-FDS, 2021 WL 8649392, at *2 (D. Mass. Aug. 25, 2021) (finding the "defendants simply have not presented any argument or evidence to suggest that [the PR consultant] was indispensable or served a specialized role in communicating with [the company] or [the company's attorney].  The defendants similarly have not argued that [the PR consultant] translated or interpreted any matters beyond the reach of the attorneys[.]"); *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-cv-585, 2014 WL 7238354, at *2 (S.D.N.Y. Dec. 19, 2014) (noting that defendant made "no showing as to how the outside marketing firm improved counsel's comprehension of [defendant's] communications to counsel, or vice versa," and "did not challenge [plaintiff's] assertion that [defendant] easily could have conveyed marketing limitations to its marketing firm without disclosing legal advice").

This case falls into the narrow category of cases outlined by *In re Grand Jury Subpoena dated March 24, 2003*, 265 F. Supp. 2d 321, 323-24 (S.D.N.Y. 2003), in which the PR firm's target audience was not the public at large, but rather prosecutors and regulators responsible for charging decisions in the investigations concerning the "Target."  Although the procedural posture and other unique details differ here, the court finds that Quanterix's PR specialists were engaged in at least some of the same activities the Southern District of New York held fell within the zone of privilege, namely assisting counsel in "(a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, [and] (b) seeking to avoid or narrow charges brought against the client." *Id.* at 330.

The court agrees with Quanterix that "each of the contested documents is covered by the attorney-client privilege," *see* #20 at 21; however, to the extent that the email attachments identified on Quanterix's privilege log claim only work product protection, *see* #3-22 (sealed), the court finds for the reasons discussed above that such documents are protected by that doctrine as well.  These were not documents prepared in the normal course of business, but rather created with an eye toward minimizing liability associated with potentially imminent litigation.  Moreover, the revisions and comments embedded in the drafts clearly reflect counsel's legal strategy and "both contemplate litigation and reflect preparation for litigation."  *See Felisberto*, 541 F. Supp. 3d at 150.

Therefore, the court finds that Quanterix has made a good faith effort to provide plaintiffs with the documents they seek without waiving privilege.  They need go no further to meet their obligations under Rule 45.

V.    Conclusion.

For the reasons discussed above, the court recommends that plaintiffs' motion to compel the production of documents (#1) be denied.

VI.    Review by the District Judge.

The parties are advised that any party who objects to the Reports and Recommendation must file specific written objections with the Clerk of this Court within fourteen (14) days of the date of the Reports and Recommendation. The objections must specifically identify the portion of the Reports and Recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v.*

*Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–9 (1st Cir.

1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas*

*v. Arn*, 474 U.S. 140 (1985).

May 9, 2023                                    /s/ M. Page Kelley
                                               M. Page Kelley
                                               United States Magistrate Judge