**UNITED STATED DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BOZOEGIS et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) Case No. 1:24-mc-91041-AK |
| CASSAVA SCIENCES, INC. et al, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**NON-PARTY QUANTERIX'S RESPONSES TO PLAINTIFFS' OBJECTIONS TO THE MAY 9, 2024 REPORT AND RECOMMENDATION DENYING PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS FROM QUANTERIX CORP.**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................... 3

III.   PROCEDURAL HISTORY ................................................................. 6

IV.   LEGAL STANDARD ......................................................................... 7

V.    ARGUMENT ..................................................................................... 11

    A.   The Report Correctly Held that Quanterix Did Not Waive Any Attorney-Client Privilege because Quanterix's PR Consultants were Necessary to Provide Legal Advice and Served as Translator's for Quanterix's Counsel. ..................................... 11

    B.   The Report Correctly Analyzed S.D.N.Y. Case Law and Did Not Err in Invoking the Kovel Exception. ............................................................................... 14

    C.   The Report Correctly Held that Documents Sought by Plaintiffs Are Protected Attorney Work Product Created in Anticipation of Litigation. ................................. 16

    D.   The Report Properly Concludes That Communications to Jamie Taylor Are Protected Under the Attorney-Client Privilege and Attorney Work Product Doctrine. ............ 17

    E.   Quanterix Should Be Awarded Costs Because Plaintiffs Continue to Advance Arguments in Bad Faith. ............................................................................ 19

VI.   CONCLUSION ................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Banco Do Brasil, S.A. v. 275 Wash. St. Corp.*,
   No. 09-11343-NMG, 2012 U.S. Dist. LEXIS 51358 (D. Mass. Apr. 12, 2012) ...................10

*Bryan Corp. v. Chemwerth, Inc.*,
   296 F.R.D. 31 (D. Mass. 2013).................................................................................11, 18

*Cavallaro v. United States*,
   284 F.3d 236 (1st Cir. 2002) .........................................................................................8, 9

*Conway v. Licata*,
   104 F. Supp. 3d 104 (D. Mass. 2015) ...............................................................................13

*Crane Sec. Techs., Inc. v. Rolling Optics, AB*,
   230 F. Supp. 3d 10 (D. Mass. 2017) ...............................................................................8, 9

*Dahl v. Bain Capital Partners, LLC*,
   714 F. Supp. 2d 225 (D. Mass. 2010) ............................................................................9, 11

*Felisberto v. Dumdey*,
   541 F. Supp. 3d 142 (D. Mass. 2021) ..............................................................................16

*FTC v. GlaxoSmithKline*,
   294 F.3d 141 (D.C. Cir. 2002) .....................................................................................10, 19

*Hickman v. Taylor*,
   329 U.S. 495 (1947)..........................................................................................................11

*In re Bieter Co.*,
   16 F.3d 929 (8th Cir. 1994) .........................................................................................10, 19

*In re Cassava Sciences, Inc. Securities Litigation*,
   No. 1:21-cv-00751-DAE (W.D. Tex.) ................................................................................3

*In re Copper Mkt. Antitrust Litig.*,
   200 F.R.D. 213 (S.D.N.Y. 2001) .......................................................................................19

*In re Grand Jury Subpoenas Dated March 24, 2003*,
   265 F. Supp. 2d 321 (S.D.N.Y. 2003)...........................................................................9, 15

*Lynx Sys. Devs. v. Zebra Enter. Sols. Corp.*,
   No. 15-12297-GAO, 2018 U.S. Dist. LEXIS 52628 (D. Mass Mar. 28, 2018)...............10, 19

*Maine v. United States Dep't of Interior*,
    298 F.3d 60 (1st Cir. 2002)..................................................................................10

*Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*,
    840 F.2d 985 (1st Cir. 1988)............................................................................7, 11

*U.S. v. Textron Inc. & Subsidiaries*,
    577 F.3d 21 (1st Cir. 2009)..................................................................................10

*United States ex. rel. Wollman v. Massachusetts Gen. Hosp., Inc.*,
    475 F. Supp. 3d 45 (D. Mass. 2020) ....................................................8, 9, 10, 11

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961)..................................................................................9

*United States v. Mass. Inst. of Tech.*,
    129 F.3d 681 (1st Cir. 1997) ..........................................................................11, 18

**Rules**

Fed. R. Civ. P. 26.....................................................................................................10, 18

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), Non-Party Quanterix Corporation ("Quanterix") responds to Plaintiffs Bozoegis et al.'s ("Plaintiffs") Objections (Doc No. 37, "Objections") to Magistrate Page Kelley's May 9, 2024 Report and Recommendation (Doc No. 31, "Report") recommending denying Plaintiffs' Motion to Compel certain documents listed in Quanterix's privilege log (Doc No. 1 "Motion"). Quanterix respectfully submits that the Report correctly determined that the documents sought by Plaintiffs are attorney-client privileged and protected by the attorney work product doctrine, and thus Plaintiffs' Motion should be denied and Quanterix should be awarded costs.

## I.    INTRODUCTION

In a thorough and carefully considered Report, following briefing, oral argument, and *in camera* review,  Magistrate Kelley correctly determined that the Plaintiffs' Motion should be denied because the documents sought by Plaintiffs were protected from disclosure under the attorney-client privilege, and further were protected attorney work product since the documents were not "prepared in the normal course of business, but rather created with an eye toward minimizing liability associated with potentially imminent litigation." (Doc No. 31 at 7). The Report concluded that "the revisions and comments embedded in the drafts clearly reflect counsel's legal strategy and both contemplate litigation and reflect preparation for litigation" *Id*. The Report's conclusions, reached only after reviewing the challenged documents *in camera* at Plaintiffs' request, are firmly supported by the facts and the law.

Plaintiffs' Objections seeks the Court's de novo review under Rule 72(b)(3), which applies to "any part of the magistrate judge's disposition that has been properly objected to."  Plaintiffs' Objections purport to challenge the entirety of the Report.  In doing so, Plaintiffs continue to ignore the facts of the case, mislead the Court, and waste the time and resources of a non-party which

"has made a good faith effort to provide plaintiffs with the documents they seek without waiving privilege" *Id.*

Plaintiffs' Objections incorrectly assert that the Report failed to assess whether Quanterix met its burden of demonstrating that its consultants were in fact, necessary to the provision of legal advice. (Doc No. 37 at 1). Plaintiffs appear to focus their argument on the fact that the Report does not do a separate analysis of each of Quanterix's consultants, however the stylistic decision by Magistrate Kelley to write about Quanterix's consultants in a combined analysis in no way suggests the Report did not consider each consultant's role separately. Plaintiffs' Objections also assert two patently false statements: 1) that Quanterix did not contend each of its public relations ("PR") consultants were necessary to the provision of legal advice; and 2) Quanterix failed to provide any explanation or evidence as to how the PR consultants were necessary for the company to receive legal advice. *Id.* at 2. A simple review of Quanterix's Opposition to Plaintiffs' Motion (Doc No. 20 "Opposition") and Affidavit of John C. Dougherty (Doc No. 20-2 "Dougherty Aff." (sealed)) which both expand upon the role of Quanterix's consultants, exposes the Plaintiffs' disregard of the record evidence. Plaintiffs similarly ignore Magistrate Kelley's analysis and *in camera* review of draft press releases, finding the drafts "clearly reflect counsel's legal strategy" and "contemplated litigation and reflect preparation for litigation." (Doc No. 31 at 7). Plaintiffs simply repeat their failed argument that the drafts were not prepared for use in litigation (Doc No. 37 at 2), declining to point to any evidence of why this is so.

Finally, Plaintiffs are still unable to assert why the documents they seek are relevant to their claims against Cassava Sciences Inc. ("Cassava") in the underlying securities litigation. Similar to their Motion, Plaintiffs' Objections maintain Quanterix's privileged communications surrounding its legal strategy to draft a press release, is relevant to fraud claims against Cassava,

2

yet no explanation of how or why the communications are relevant is offered. *Id.* at 1. Plaintiffs were similarly unable to provide an explanation of relevancy at oral argument, however the Report declined to address relevancy due to the fact that each document sought was protected attorney-client privilege and attorney work product. (Doc No. 31 at n. 4).

## II.    FACTUAL BACKGROUND

As set forth in detail in its papers in opposition to the Motion, non-party Quanterix is a company involved in the sale of products and services for biomarker detection and headquartered in Billerica, Massachusetts. Plaintiffs are putative representatives for a class of shareholders suing Cassava and certain Cassava executives in consolidated securities litigation pending in the Western District of Texas. *In re Cassava Sciences, Inc. Securities Litigation*, No. 1:21-cv-00751-DAE (W.D. Tex.). In that underlying litigation, Plaintiffs allege that Cassava made misrepresentations or omitted material information about the status of Cassava's experimental Alzheimer's therapy known as simufilam, including data presented by Cassava at a July 2021 Alzheimer's Associate International Conference ("AAIC"). Non-party Quanterix is not, and never has been, a defendant in the underlying litigation against Cassava. (Doc No. 2 at 1-2).

As the Report points out, relevant here are a series of press statements that followed an August 24, 2021 publication of a Citizen Petition filed with the U.S. Food and Drug Administration ("FDA"). (Doc No. 31 at 2, citing Doc No. 2 at 7-8; Doc No. 20 at 5-6). The Citizen's Petition raised "grave concerns about the quality and integrity of the laboratory-based studies surrounding simufilam, including allegations that Cassava had purposefully removed data points from its presentation at the AAIC to make the results appear more significant then they were. (Doc No. 31 at 2 citing Doc No. 2 at 8). Cassava denied the Citizen Petition allegations in an August 25, 2021 press statement (the "First Cassava Statement") in which it stated the data presented at the AAIC

was "generated by Quanterix Corp., an independent company." (Doc No. 20 at 6; Doc No. 3-2 at ¶317).

Upon issuance of the First Cassava Statement, Quanterix understood that the nature of the allegations against Cassava and its attempts to feature Quanterix in its public statements were a prelude to litigation or external investigations which could attempt to draw in Quanterix, and that any Quanterix response would need to be guided by legal advice. Doc No. 20-2 at ¶4 (sealed). To that end, Quanterix immediately supplemented its outside counsel team with a Mintz Levin litigation partner experienced in data integrity investigations, government enforcement, and securities litigation matters. *Id.* at ¶1.

The following day, on August 26, 2021, Quanterix's general counsel, John Fry, engaged Sard Verbinnen & Co. ("Sard Verb"), and consulted with Pan Communications ("PAN Comm") and Heidi Creighton as a public relations experts to provide Quanterix with their expertise to help guide the legal response. *Id.* at ¶¶10-12. Sard Verb, among other responsibilities, was tasked with responding to inquiries from the press and other third parties generated by Cassava's public statements. *Id.* at ¶10. PAN Comm who had previously been retained by Quanterix on other matters, was given a new scope of work specifically related to Cassava's press release, to provide expertise to Quanterix's lawyers so they could provide legal advice to the company. *Id.* at ¶11. Heidi Creighton was also an existing consultant for Quanterix, and at this time, was specifically consulted regarding Cassava. *Id.* at ¶12. Each consultant had an agreement with Quanterix that included confidentiality provisions so that Quanterix could disclose and discuss confidential company information with them. *Id.* at ¶¶10-12.

After careful review of the situation and advice from Quanterix's legal team, who consulted with the external communications consultants, Quanterix issued a press release on August 27, 2021

(the "Quanterix Statement"), stating that while it provided raw data to its customer Cassava, it did not interpret test results or prepare the data charts alleged to have been manipulated by Cassava. *Id*. at ¶5; (Doc No. 3-2 at ¶¶16-17, 323, 499). Later that morning, Cassava issued a responsive statement (the "Second Cassava Statement") that correctly characterized Quanterix' limited role with respect to the sample testing and reporting. (Doc No. 20-2 at ¶7; Doc No. 3-2 at ¶16). Plaintiffs allege that Casava's share price dropped 17.66% following the release of the August 27 statements. (Doc No. 2 at 8; Doc No. 20 at 6; Doc No. 3-2 at ¶¶323-27).

Quanterix's decision to issue the Quanterix Statement was led by Quanterix General Counsel John Fry, who retained the expertise of outside litigation counsel at Mintz Levin and utilized the communications professionals at PAN Comm, Sard Verb, and Heidi Creighton in order to provide Quanterix with legal advice and how to best respond to the First Cassava Statement. (Doc No. 20-2 at ¶¶3, 5-6). The ultimate decision to issue a press release, and the manner in which it was drafted was in direct response to legal advice and the anticipation of litigation. *Id*. at ¶¶4, 8. As expected, later that day on August 27, 2021, Quanterix was subpoenaed by ███████████ ████████████████████ for documents and communications related to Cassava. *Id*. at ¶14. The following day after receiving this subpoena, counsel for Quanterix began drafting a legal strategy for compliance that it could share with Quanterix's board of directors ("Board Note"). *Id*. at ¶ 15. This strategy was also shared with Quanterix's existing business consultant, Jamie Taylor. *Id.* at ¶16. Well prior to the Cassava press release. Taylor entered into NDA's with Quanterix so that Quanterix could disclose and discuss confidential company information with her. *Id.*

On August 31, 2021 Quanterix received a request from ██████████████████ ████████████████ for documents and communications related to Cassava. *Id.* at ¶17. For the next several months, Quanterix, through Mintz Levin, worked to respond to the ███████████

███████. *Id.* at 18. None of the privileged documents sought by Plaintiffs' Motion to Compel were sought by or produced to the ████████████ due to their privileged nature. *Id.*

## III.    PROCEDURAL HISTORY

Plaintiffs served Quanterix with a Subpoena on June 15, 2023, which included requests for documents related to the Quanterix Statement, the poster Cassava presented at the AAIC, and the underlying data generated by Quanterix for Cassava from January 1, 2020 to the present. (Doc No. 2 at 9; Doc No. 3-1 at 11-13). In an effort to comply with Plaintiffs' subpoena, Quanterix harvested, processed, and reviewed all documents including the word "Cassava" within the subpoena's date range. (Doc No. 20-2 at ¶10). On July 11, 2023, Quanterix produced 687 responsive documents. (Doc No. 20 at 6). Following a series of meet and confers, Quanterix produced an additional 149 documents on July 20, 2023, including an abbreviated privilege log per the parties' agreement. (Doc No. 20 at 7; Doc No. 2 at 9). On July 28, 2023, Quanterix produced an additional eight documents that it had previously withheld or redacted, as well as a more detailed privilege log. (Doc No. 20 at 8; Doc No. 2 at 9). On August 9, 2023, the parties engaged in another meet and confer, during which Plaintiffs requested information regarding retention of Quanterix's outside counsel and certain PR experts that appeared on Quanterix's privilege log. (Doc. No. 2 at 10; Doc No. 20 at 8). At Plaintiffs' request, Quanterix provided redacted copies of retention and non-disclosure agreements with the PR experts. (Doc No. 20 at 8). On September 21, 2023, Quanterix produced an additional 32 documents with line redactions that had previously been withheld fully, as well as an updated privilege log with 70 entries. (Doc No. 20 at 8-9; Doc No. 2 at 12).

On February 1, 2024 Plaintiffs filed a Motion to Compel challenging 68 of the 70 entries on Quanterix's most recent privilege log. (Doc No. 1). Plaintiffs contended that the inclusion of PR experts on attorney communications destroyed privilege because the communications concerned communications strategy, not legal advice. (Doc No. 2 at 15-21). Plaintiffs further

argued that the work product doctrine did not apply because the documents were created as a PR campaign, not in anticipation of litigation or government investigation. (Doc No. 2 at 21-24; Doc No. 23 at 5-6). In the alternative, Plaintiffs requested *in camera* review of 11 unredacted documents and any associated attachments. (Doc No. 2 at 24). On February 22, 2024, Quanterix filed its Opposition to Plaintiffs' Motion, maintaining that the PR experts were sought by and necessary to the company's legal team in navigating the crisis that followed the First Cassava Statement, rendering the communications privileged and/or protected work product. (Doc No. 20).

Magistrate Kelley heard argument on April 25, 2024, after which it ordered Quanterix to produce *ex parte* the documents identified in plaintiffs' motion (Doc No. 29). Quanterix provided the requested documents on April 30, 2024. (Doc No. 31 at 5). On May 9, 2024 Magistrate Kelley issued her Report and Recommendation denying Plaintiffs' Motion to Compel. *Id.*

## IV.    LEGAL STANDARD

Plaintiffs are required in their Objections to "specifically identify the portion of the Report and Recommendation to which objections are made and state the basis for such objections." (Doc No. 31 at 9). A de novo review under Rule 72(b)(3) does not mean that Plaintiffs are dealt a new hand: "At most, the party aggrieved [by the Report] is entitled to a review of the bidding rather than to a fresh deal. The rule does not permit a litigant to present new initiatives to the district judge." *Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Plaintiffs' Objections to the Report are more broadside than surgical. Having asked for and received the *in camera* review they asked for, Plaintiffs ignore the judgments made by Magistrate Kelley in her review. As demonstrated below, none of the Objections are well-founded, and no portion of the Report should be rejected or modified as the Report aptly applies the law regarding attorney-client privilege and the work product doctrine to the factual record presented

by the parties, including through briefing, oral argument, and *in camera* review of **every** document requested by Plaintiffs.

The sole issue for the Court is whether the challenged documents are protected by the attorney-client privilege and/or attorney work product doctrine. The elements of the attorney-client privilege are well known:

> "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J. H. Wigmore, *Evidence* § 2292, at 554) (McNaughton rev. 1961)). The privilege protects communications that are confidential and are made for the purpose of seeking or receiving legal advice. *United States ex. rel. Wollman v. Massachusetts Gen. Hosp., Inc.*, 475 F. Supp. 3d 45, 63 (D. Mass. 2020) (quoting *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011)); *see Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 15-16 (D. Mass. 2017) (Kelley, M.J.) ("Communications must 'have been intended to be confidential and made for the purpose of giving or obtaining legal advice' to qualify as privileged.") (quoting *Cavallaro*, 284 F.3d at 245).

Although disclosing attorney-client communications to a third party generally undermines the privilege, there are exceptions, such as when an expert is employed to assist a lawyer in rendering legal advice. *Cavallaro*, 284 F.3d at 246-47 (citing with approval *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961), in which the Second Circuit applied this exception to communications involving an accountant who was assisting an attorney in preparing a client's case: "[B]ecause 'the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others,' the attorney-client 'privilege must include all the persons

who act as the attorney's agents.'") (internal citations omitted). "Significantly, in assisting the lawyer, the third party's presence must be 'necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit' and the communication 'must be made for the purpose of obtaining legal advice from the lawyer.'" *Wollman*, 475 F. Supp. 3d at 66 (quoting *Cavallaro*, 284 F.3d at 247) (additional citations omitted); *See Crane*, 230 F. Supp. 3d at 25 (finding communications with investment banker retained by plaintiff to assist attorney with a particular transaction, and whose advice "was necessary, or required" for the attorney to render advice to his client, was privileged); *see also In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 330-31 (S.D.N.Y. 2003) ("[L]awyers may need skilled advice as to whether and how possible statements to the press—ranging from 'no comment' to detailed factual presentations—likely would be reported in order to advise a client as to whether the making of particular statements would be in the client's legal interest.").

"The court in *Cavallaro*, however, stressed that the third-party's assistance must be nearly indispensable or serve some specialized purpose in facilitating attorney-client communications." *Crane*, 230 F. Supp. 3d at 17; *see Dahl v. Bain Capital Partners, LLC*, 714 F. Supp. 2d 225, 227-28 (D. Mass. 2010) ("The exception . . . does not apply to instances where an attorney's ability to represent a client is merely improved by the assistance of the third party.") (citation omitted). Moreover, the advice must be legal; business advice will not sustain the exception. *Dahl*, 714 F. Supp. 2d at 228 (citing *Cavallaro*, 284 F.3d at 248-29; *Kovel*, 296 F.2d at 922; and *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 111 (S.D.N.Y. 2005)).

In addition to expert consultants, when a third party is functionally the equivalent of an internal employee, its communications are protected just as if the third party was an employee of the company asserting the privilege. *FTC v. GlaxoSmithKline*, 294 F.3d 141 (D.C. Cir. 2002); *see*

*also In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994). The functional equivalent doctrine provides that certain third-party agents of corporate entities, such as consultants, can be considered the "functional equivalent" of corporate employees by virtue of their close connection to the corporate entity. *See Lynx Sys. Devs. v. Zebra Enter. Sols. Corp.*, No. 15-12297-GAO, 2018 U.S. Dist. LEXIS 52628, at *6-7 (D. Mass Mar. 28, 2018).[1]

The work product doctrine protects documents "that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3)(A); *see Wollman*, 475 F. Supp. 3d at 61. The doctrine does not protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *U.S. v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 30 (1st Cir. 2009) (quoting *Maine v. United States Dep't of Interior*, 298 F.3d 60, 70 (1st Cir. 2002)). The core purpose of the privilege "is to protect the adversary trial process itself", *Maine v. U.S. Department of the Interior*, 298 F.3d 60, 66 (1st Cir. 2002) (internal quotation marks omitted), and to preserve a "zone of privacy" within which a lawyer can prepare and develop legal theories and strategy "with an eye toward litigation." *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Disclosure of work product to a third-party does not necessarily waive the protection— only disclosing material in a way inconsistent with keeping it from an adversary waives work-product protection. *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997); *see Bryan Corp. v. Chemwerth, Inc.*, 296 F.R.D. 31 (D. Mass. 2013).

---

[1] Although this doctrine has not yet been applied in this Circuit, Courts acknowledge the doctrine and suggest it should be applied where the facts permit. *See Lynx*, 2018 U.S. Dist. LEXIS 52628 (noting functional equivalent doctrine has not been adopted within this Circuit or applied within this District, but declining to apply it where third party did not meet standard); *Banco Do Brasil, S.A. v. 275 Wash. St. Corp.*, No. 09-11343-NMG, 2012 U.S. Dist. LEXIS 51358 (D. Mass. Apr. 12, 2012) (applying Massachusetts law and recognizing functional equivalent doctrine, but declining to apply it on the facts).

V.      **ARGUMENT**

      A.      **The Report Correctly Held that Quanterix Did Not Waive Any Attorney-Client Privilege because Quanterix's PR Consultants were Necessary to Provide Legal Advice and Served as Translator's for Quanterix's Counsel.**

      The Plaintiffs incorrectly assert that the Report does not properly apply the *Kovel* doctrine to its analysis, appearing to take issue with the fact that the Report does not mimic the structure and/or exact language of the decision in *Dahl*, 714 F. Supp. 2d at 227. As a threshold matter, since Plaintiffs did not cite *Dahl* in their Motion (Doc No. 2) or Reply (Doc No. 21), they should be precluded from advancing an argument based on *Dahl* in its Objections. *See Paterson-Leitch Co.*, 840 F.2d at 990-91 ("an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate"). Further, *Dahl* does not create any extra "prong" which must be addressed. *Dahl* expands upon the *Kovel* doctrine's requirement that "in assisting the lawyer, the third party's presence must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Wollman*, 475 F. Supp. 3d at 66 (quoting *Cavallaro*, 284 F.3d at 247). Simply because the Report does not distinctly enumerate its findings that Quanterix's consultants were 1) necessary **AND** 2) interpretive (Doc No. 37 at 6) does not mean that Magistrate Kelley did not reach that exact conclusion. Similarly, just because the Report does not describe in detail **how** each of Quanterix's consultants were necessary to the provision of legal advice does not undercut Magistrate Kelley's *in camera* findings that each of the PR consultants were in fact necessary to Quanterix's counsel's ability to advise the company.

      To the contrary, the Report held that in regards to communications with PAN Comm, Sard Verd, and Heidi Creighton ("Quanterix PR consultants")[2] the communications were privileged. The

---

[2] Consultant Jamie Taylor was consulted by Quanterix **after** the Quanterix Statement and **after** Quanterix's ████████ ████████████████████, thus the privilege of communications with Taylor requires a distinct analysis already

Report credited the affidavit of Attorney Dougherty detailing the context within which the documents were written, "where attorneys were called on in an emergency basis to respond to what was perceived to be a crisis." (Doc No. 31 at 7). The Report further reasoned,

> Drafting the Quanterix Statement was **inextricably enmeshed with the discussion and implementation of legal advice** sought to minimize potential liability and/or avoid government investigations, both of which were rationally foreseeable under the circumstances. The PR specialists' expertise was sought, in this instance, by Quanterix's attorneys in furtherance of these legal goals, and was **integral to the attorneys' provision of effective legal advice**. In other words, this is not a case in which PR specialists were enlisted to battle bad publicity, but rather one in which media expertise was **necessary to assess the risks and liabilities** associated with how to respond publicly—and indeed, whether to respond at all—to an announcement that had implicated Quanterix in wrongdoing and opened it up to civil liability and/or government investigation. (Doc No. 31 at 7) (internal citations omitted) (emphasis added).

There is no reading of the Report in which one could reasonably argue that Magistrate Kelley did not properly apply the *Kovel* doctrine in its analysis of Quanterix's communications with its PR experts. Following briefing, argument, and *in camera* review Magistrate Kelley properly held that Quanterix's communications with its PR experts were necessary for the effective consultation between the client and counsel, and made for the purpose of obtaining legal advice. Simply because the word "translate" does not appear in the Report does not indicate a failure by Magistrate Kelley to evaluate any prong or principle of *Kovel.*

Further, Quanterix is not required to explain exactly *how* its PR experts were involved in its legal strategy to trigger the privilege. Plaintiffs incorrectly argue "Quanterix offered no explanation, and the R&R stated none, regarding how any of the consultants, let alone each of them, were necessary to the provision of legal advice." (Doc No. 37 at 10). This is false. The Affidavit of

---

briefed by Quanterix for Magistrate Kelley. Further, Plaintiffs did not request Magistrate Kelley perform *in camera* review of either of the two communications with Taylor, despite their ability to do so.

Attorney Dougherty explains that the PR experts: assisted in drafting and revising the press release, informed legal strategy, and monitored and provided insight on follow-up inquiries. (Doc No. 20-2 at ¶¶6, 8-9). No caselaw demands that Quanterix divulge the minute specifics of how its PR experts informed its legal strategy, thereby disclosing legitimately privileged information. Quanterix's refusal to reveal privileged information in its opposition of Plaintiffs' Motion does not warrant the affidavit or testimony of Attorney Dougherty insufficient under *Kovel*, or "conclusory" as Plaintiffs allege.  Simply because Plaintiffs are disappointed that the Report credited Attorney Dougherty's Affidavit and live testimony presented at oral argument, does not permit Plaintiffs to undermine or unilaterally discredit the facts established.

Nothing exemplifies the baselessness of Plaintiffs' Objections more than their brand new argument that because Attorney Dougherty is an experienced attorney "it is improbable that any of the consultants were necessary to the provision of legal advice on this record." (Doc No. 37 at 11). The fact that Attorney Dougherty has previously advised clients on "litigation-related implications involved in responding to emergent situations" (Doc No. 20-2 at ¶1) does not indicate he should possess all the requisite knowledge of a PR expert of should abstain from seeking public relations advice in order to advice his client. The mere fact that Plaintiffs suggest this highlights their continuing disregard of relevant law and established facts in this case. Plaintiffs also failed to raise this particular argument in their Motion or Reply (never once previously citing to *Conway v. Licata*, 104 F. Supp. 3d 104, 125 (D. Mass. 2015) and should be precluded from asserting the argument in their Objections.

Plaintiffs make the additional false statements in their Objections, which the Court should consider when assessing the credibility of Plaintiffs' arguments and Quanterix's request for costs:

- "*The record does not show that [Quanterix] hired [the consultants] to assist [Quanterix attorneys] in providing legal advice.*" (Doc No. 37 at 8).

This is false and refuted by the record evidence, specifically Attorney Dougherty's Affidavit at Paragraph 8 (Doc. No 20-22 at ¶8).

- "*None of the PR retainer agreements state, and Quanterix does not assert, that any of the consultants was hired for the purpose of providing or facilitating legal advice.*" (Doc No. 37 at 8).

  This is false, as Plaintiffs have not seen the PR retainer agreements, but have only viewed redacted versions to confirm their existence and date. Further, Quanterix has asserted multiple times that its consultants were engaged and consulted on the matter of Cassava in order to facilitate legal advice. *See* Doc No. 20-2 at ¶8-9, 13; Doc No. 20 at § III (C).

- "*Nor did Quanterix provide or even reference any contemporaneous documentation to suggest that at the time Quanterix was responding to Cassava's press release, that the consultants' professional relationship with Quanterix changed in a way that would trigger a privilege.*" (Doc No. 37 at 8-9).

  This is false. Quanterix retained Mintz the same day Cassava issued its First Statement (Doc No. 20-2 at ¶ 2); Sard Verb was retained one day following the First Cassava Statement. *Id*. at ¶10; PAN Comm was provided a new scope of work specifically relating to the Cassava Statements. *Id.* at ¶11; Heidi Creighton was consulted by Quanterix General Counsel immediately following the First Cassava Statement and specifically in regards to the drafting and release of the Quanterix Statement. *Id*. at ¶ 12.

- "*Moreover, according to Quanterix, only PAN Comm and Sard were involved in drafting the August 27 release, not Creighton.*" (Doc No. 37 at 11).

  This is misleading and refuted by Attorney Dougherty's Affidavit and privilege log entries detailing emails to Creighton specifically regarding review of Quanterix's Statement. *See* Doc No. 20-2 at ¶ 12; Doc No. 3-22 (Exhibit V).

- "*Here, Quanterix likewise does not content that any of the consultants served as a translator of information for its attorneys.*"

  This is false and contradicted by Attorney Dougherty's Affidavit. *See* Doc No. 20-22 at ¶¶8-9, 13.

### B.    The Report Correctly Analyzed S.D.N.Y. Case Law and Did Not Err in Invoking the *Kovel* Exception.

Plaintiffs' argue that simply because *In re Grand Jury*, 265 F. Supp. 2d at 321 has *some* facts distinct from Quanterix's use of consultants, the Report erred in relying on the case. As is the bulk of Plaintiffs' Objections, this assertion is self-serving, unsupported, and misplaced.

Counsel for Quanterix knew that the First Cassava Statement, ████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████ (Doc No.

20-2 at ¶4) (emphasis added). Similar to the public relations consultants in *In re Grand Jury* who

were tasked to help counter the growing public pressure on prosecutors to indict, Quanterix's

communication consultants were engaged by Quanterix's legal team in order to distinguish

Quanterix from Cassava in hopes of deterring targeted investigations and derivative lawsuits. Just

as in *In re Grand Jury*, Quanterix's consultants did not engage in typical publicity campaigns

because their audience was not simply the general public, but potential plaintiffs and government

actors responsible for investigating the allegations against Cassava. (Doc No. 20 at 15-16). In direct

contradiction to the record evidence established in Attorney Dougherty's Affidavit, Plaintiffs'

Objections present additional misrepresentations to the Court:

- "*None of the four third-party consultants was hired to reduce the risk that prosecutors and regulators would feel pressure from the constant anti-Target drumbeat in the media to bring charges or for any other legal purpose.*" (Doc No. 37 at 14.)
- "*No witness claims that a significant aspect of the PR firm's assignment that distinguished it from standard public relations work was that [its] target audience was not the public at large, but rather the prosecutors and regulators responsible for charging decisions.*" (Doc No. 37 at 14-15.)
- "*Quanterix's own declaration concedes through its silence that the four consultants did not work to help Quanterix avoid investigations or legal liability and that the primary audience of Quanterix's public statement was not prosecutors or government regulators.*" (Doc No. 37 at 15.)

The Report correctly concluded that, "This case falls into the narrow category of cases

outlined by *In re Grand Jury Subpoena dated March 24, 2003*, 265 F. Supp. 2d 321, 323-24

(S.D.N.Y. 2003), in which the PR firm's target audience was not the public at large, but rather

prosecutors and regulators responsible for charging decisions in the investigations concerning the

"Target." Although the procedural posture and other unique details differ here, the court finds that

Quanterix's PR specialists were engaged in at least some of the same activities the Southern District of New York held fell within the zone of privilege, namely assisting counsel in "(a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, [and] (b) seeking to avoid or narrow charges brought against the client." *Id.* at 330. (Doc No. 31 at n.5).

### C.   The Report Correctly Held that Documents Sought by Plaintiffs Are Protected Attorney Work Product Created in Anticipation of Litigation.

While the Report agreed with Quanterix that each of the contested documents is covered by the attorney-client privilege, to the extent that documents identified on Quanterix's privilege log claim only work product protection, the Report found that such documents are also protected by that doctrine. The Report reasoned, "these were not documents prepared in the normal course of business, but rather created with an eye toward minimizing liability associated with potentially imminent litigation. Moreover, the revisions and comments embedded in the drafts clearly reflect counsel's legal strategy and "both contemplate litigation and reflect preparation for litigation." *See Felisberto v. Dumdey*, 541 F. Supp. 3d 142, 150 (D. Mass. 2021). (Doc No. 31 at 9). Further, the Report concluded, "drafting the Quanterix Statement was inextricably enmeshed with the discussion and implementation of legal advice sought to minimize potential liability and/or avoid government investigations, both of which were **rationally foreseeable** under the circumstances." (Doc No. 37 at 7) (emphasis added).

Despite this language from the Report, Plaintiffs continue to argue, without merit, that "Quanterix has not established that the [draft] press releases are protected as attorney work product" and that the Report "fails to assess whether Quanterix' self-serving statement that the documents were prepared in anticipation of litigation was objectively reasonable." (Doc No. 37 at

16). Not only do Plaintiffs' arguments ignore the very language used in the Report, but it disregards the record in the case.

Here, the record reflects that the decision to draft Quanterix's press release and the manner in which it was drafted resulted from the anticipation of litigation and directly related to the company's legal strategy. John Dougherty states that at the time of his engagement with Quanterix *he immediately suspected Quanterix would receive government agency subpoenas, or be drawn into shareholder and derivative suits.* The decision to draft a press release at all, and the wording of the press release was a direct result of Attorney Dougherty's anticipation of litigation and his advice to Quanterix. Attorney Dougherty's ability to predict a ███████████████ one day before receiving the subpoena is exactly why Quanterix retained him to provide legal advice. Quanterix should not be punished by being compelled to disclose attorney work product simply because its litigation counsel correctly anticipated litigation one day before it received a ██ ███████. Doc No. 20 at 18-10.

### D. The Report Properly Concludes That Communications to Jamie Taylor Are Protected Under the Attorney-Client Privilege and Attorney Work Product Doctrine.

Plaintiffs spend much of its Objections focusing on two communications to Jamie Taylor, which Quanterix has always contended are both attorney-client privileged, and protected work product. Plaintiffs attempt to attack the fact that the Report does not go into detail regarding Jamie Taylor's work as a consultant, but this is because Plaintiffs almost abstained from oral argument regarding Taylor entirely. Further, in Plaintiffs' requested documents for *in camera* review (in which Magistrate Kelley reviewed **each document** requested) Plaintiffs declined to even ask the Magistrate to review either communication involving Taylor. (Doc No. 2 at 24).

In an obvious distinction from Quanterix's PR experts, the communications at issue involving Jamie Taylor were both sent on August 28, 2021, one day **after** Quanterix received the

August 27, 2021 ██████████████████████████████████████████████████
███████████████████████. Further the communications at issue include a "Battle Draft Plan" and
a "Note to Board" drafted by Quanterix's outside counsel Mintz Levin in direct response to the
████████████████ (Doc No. 2-22 at entry 59, 65). The purpose of these documents was to inform
Quanterix board members and its in-house legal team of the general situation involving Cassava,
Quanterix's legal rationale in drafting a press release, and Quanterix's strategy in responding to
the ████. The documents were both prepared in anticipation of litigation,
███████████████████████ and would not have been drafted in the same manner without the existence
of this litigation. Doc No. 20-2 at ¶15.

Disclosure of work product to a third-party does not necessarily waive the protection— only
disclosing material in a way inconsistent with keeping it from an adversary waives work-product
protection. *Mass. Inst. of Tech.*, 129 F.3d at 687; *see Bryan Corp.*, 296 F.R.D. at 31. Quanterix did
not waive its work product privilege of the "Board Note" or "Battle Draft Plan" by disclosure to
Jamie Taylor because the consultant was under an NDA with Quanterix and was clearly considered
by Quanterix's CEO and general counsel to fall within the zone of privacy, thus was far from
adversarial.[3]

Further, similar to Heidi Creighton, the attorney-client privilege also extends to Quanterix's
communications with consultant Jamie Taylor because she served as a "functional equivalent" of
a Quanterix employee. The functional equivalent analysis "allows communications between . . .
agents and corporate counsel to fall within the scope of *Upjohn*, which protects communications
between corporate employees and corporate counsel." *Lynx*, 2018 U.S. Dist. LEXIS 52628, at *6-

---

[3] Plaintiffs have not attempted to meet their relevancy burden, nor have they met the even higher standard for
obtaining work product under Fed. R. Civ. P. 26(b)(3)(A). That rule requires a requesting party to show a
"substantial need for the materials to prepare its case" and that they "cannot, without undue hardship, obtain their
substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

7 (citation omitted); *see also In re Bieter Co.*, 16 F.3d at 929. Where corporate counsel works with a high-level consultant in the same manner it engages with full time employees, and where the consultant becomes an integral member of the team assigned to deal with issues that are "completely intertwined with [the company's] litigation and legal strategies[,]" then the privilege extends to communication with the company's consultants. *See FTC*, 294 F.3d at 148 (Bader Ginsburg, J.); *see also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213 (S.D.N.Y. 2001) (holding external public relations firm was "functional equivalent" of an employee of the defendant and upholding attorney-client privilege).

Privilege log entries 59 and 65 in which Quanterix CEO Kevin Hrusovsky forwards Taylor a "Battle Draft Plan" and "Board Note" drafted by outside litigation counsel, should be protected under the attorney-client privilege because Taylor is being treated as functional equivalent of a corporate employee by virtue of her close connection to the corporate entity. The consultant's close business relationships with Quanterix's executive officer resulted in her entering NDA's with Quanterix so that she could be consulted on sensitive and confidential business information. It is clear by the nature of the information Hrusovsky shared with Taylor that he considered her an integral member of the team assigned to deal with issues intertwined with Quanterix's legal strategies. Contrary to Plaintiffs' Objections, no privilege was waived in regards to Quanterix's communications with Taylor.

### E.   Quanterix Should Be Awarded Costs Because Plaintiffs Continue to Advance Arguments in Bad Faith.

Quanterix requests the Court permit it to submit its legal bills spanning from September 21, 2023 (the date of its last production) through the present motion practice. Plaintiffs' recent Objections reveal that they have pursued the instant motion practice for no good faith reason to support their case in the underlying litigation, deliberately ignoring the reasoning of the Report and

record evidence in its arguments. While Plaintiffs' counsel may wish to incur excessive legal fees in hopes of recovering those amounts from Cassava, Non-Party Quanterix should not be forced to incur such substantial legal costs defending Plaintiffs' baseless Motion and Objections.

## VI.    CONCLUSION

For the foregoing reasons, Quanterix respectfully requests that the Court adopt Magistrate Kelley's Report and Recommendation recommending denying Plaintiffs' Motion to Compel (Doc No. 31) in full.

Dated:  June 6, 2024

Respectfully submitted,

**RESPONDENT QUANTERIX CORPORATION**

By its attorneys,

_____
Katherine Galle, BBO # 691660
John C. Dougherty, BBO # 569186
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
    AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel:  (617) 542-6000
kngalle@mintz.com
jcdougherty@mintz.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants on June 6, 2024.

_____
Katherine Galle

22